**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**WINSTON-SALEM DIVISION**

| | |
|---|---|
| **IN RE:**<br><br>**K&W CAFETERIAS, INC.,**<br><br>DEBTOR | **CASE NO. 20-**<br>**CHAPTER 11** |
| **DECLARATION OF DAX C. ALLRED IN SUPPORT OF FIRST DAY MOTIONS** | |

I, Dax C. Allred, being duly sworn, state the following under penalty of perjury:

1. I am President of K&W Cafeterias, Inc. ("K&W" or the "Debtor"), a corporation organized under the laws of North Carolina and the Debtor in the above captioned chapter 11 case. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtor. If called upon to testify I would testify competently to the facts set forth herein.

2. I am familiar with the Debtor's day-to-day operations, business and financial affairs, and books and records. Except as otherwise indicated herein, all statements set forth in this declaration (the "Declaration") are based upon (a) my personal knowledge of and familiarity with the Debtor's operations, finances and restructuring efforts, (b) my review of relevant documents and information provided to me by employees of or professional advisors to the Debtor, and/or (c) my opinion based on my experience and knowledge concerning the Debtor's operations and financial and business affairs, including my general knowledge of the restaurant industry in which the Debtor operates.

3. On September 2, 2020 (the "Petition Date"), the Debtor filed a voluntary petition to commence this Chapter 11 case (the "Chapter 11 Case") under Title 11 of the United States

Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of North Carolina (the "Court").

**BACKGROUND**

4. K&W Restaurant, Inc. was formed in 1947, and under the leadership of Grady T. Allred, Sr. expanded to 16 cafeterias through the Carolinas and Virginia. Upon the death of Grady T. Allred, Sr. in 1983, the company continued to grow under the leadership of members of the Allred family and changed its name to K&W Cafeterias, Inc.

5. K&W is headquartered in Winston-Salem, N.C., and by 2020 the company had grown to 28 locations: 20 in North Carolina, 3 in South Carolina, 4 in Virginia, and 1 in West Virginia. Prior to the Petition Date, K&W ceased operations at certain locations (the "Closed Locations"), reducing the number of remaining locations to 19 in North Carolina, South Carolina and Virginia (the "Open Locations").

6. Prior to the commencement of the Chapter 11 Case, restaurant operations were temporarily suspended due to the Covid-19 restrictions imposed by various governmental authorities. The Debtor has now resumed operations subject to current restrictions and is returning to more robust operations as conditions permit.

7. In connection with its business operations, K&W obtained a number of loans the "K&W Loans") from Branch Banking & Trust Company (the "Lender"), now known as Truist Bank ("Truist") secured by certain property of the Debtor, summarized as follows:[1]

a. Master Restructure Agreement dated as of May 27, 2020 executed by K&W, DGV, LLC ("DGV"), Allred Investment Company, LLC ("Allred")[2] and the Lender.

---

[1] Truist Bank also advanced a loan in the principal amount of $6,735,200 (the "PPP Loan") to K&W pursuant to the Paycheck Protection Program, the proceeds of which have been applied in the manner required. The PPP Loan is unsecured and is subject to forgiveness to the extent permitted by applicable rules and regulations.

[2] DGV and Allred are affiliates of K&W.

b.      Amended and Restated Loan Agreement dated as of May 22, 2015 between K&W and the Lender (the "K&W Loan Agreement");

c.      Promissory Note dated as of August 4, 2006 executed by K&W in favor of the Lender in the original principal amount of $4,130,000 (the "K&W August 2006 Note");

d.       Promissory Note dated as of June 20, 2008 executed by K&W in favor of the Lender in the original principal amount of $1,760,000 (the "K&W June 2008 Note");

e.      Promissory Note dated as of October 30, 2017 executed by K&W in favor of the Lender in the original principal amount of $1,000,000 (the "K&W October 2017 Note");

f.      Promissory Note dated as of December 14, 2018 executed by K&W in favor of the Lender in the original principal amount of $2,000,000 (the "K&W December 2018 Note");

g.      Promissory Note dated as of May 25, 2012 executed by K&W in favor of the Lender in connection with a revolving line of credit in the principal amount of $4,000,000 (the "K&W May 2012 Revolving Note", and together with the K&W August 2006 Note, the K&W June 2008 Note, the K&W October 2017 Note and the K&W December 2018 Note, collectively, the "K&W Notes");

h.      BB&T Security Agreement dated as of June 20, 2008 executed by K&W and the Lender, BB&T Security Agreement dated as of May 25, 2012 executed by K&W and the Lender, Commercial Security Agreement dated as of October 30, 2017 and Commercial Security Agreement dated as of December 14, 2018, in each case securing certain obligations of K&W to the Lender;

i.      Guaranty Agreements executed by K&W with respect to loans made by the Lender to Allred Investment Company, LLC, dated December 20, 2006, July 2, 2007, December 15, 2008, May 25, 2012, May 22, 2015, and May 25, 2017; and

j.  Guaranty Agreements executed by K&W with respect to loans made by the Lender to DGV, LLC, dated August 4, 2006, December 15, 2008, December 3, 2010, May 22, 2015, and November 29, 2017.

8.  Truist also made certain loans to DGV (the "DGV Loans") and certain loans to Allred (the "Allred Loans"), in each case evidenced by certain loan agreements, promissory notes and deeds of trust imposing liens upon certain real properties owned by DGV or Allred, respectively.  Further, K&W, DGV and Allred each guaranteed the obligations of one another to the Lender.

9.  Truist asserts a first-priority security interest in the Debtor's accounts, inventory, equipment, general intangibles and proceeds and products thereof (the "Collateral"), subordinate only to properly perfected purchase money equipment financing. The Debtor is not aware of any other liens or security interests against its assets, other than the purchase money equipment financing.

10.  As of the Petition Date, the aggregate amount outstanding on the K&W Loans, the DGV Loans and the Allred Loans is approximately $10,950,153 (the "Truist Secured Claim").

11.  As of the Petition Date, the Collateral (the proceeds of which would constitute "Cash Collateral" as that term is defined in the Bankruptcy Code) presently consist of the following:

a.  Accounts (trade) with an aggregate value of approximately $932,134.

b.  Inventory (at cost) with an aggregate value of approximately $325,000.

c.  Office furniture, computers and software with an aggregate value of approximately $100,000.

    d.      Parts with an aggregate value of approximately $318,006.

    e.      Equipment (excluding dish machines financed with third parties) with an aggregate value of approximately $1,250,000.

    f.      Furniture, fixtures and equipment with an aggregate value of approximately $450,000.

    g.      Notes and accounts due from related parties with an aggregate value of approximately $8,679,422.

    h.      Leasehold improvements with an aggregate value of approximately $3,228,526.

    i.      General intangibles, trademarks, tradenames, trade secrets and going concern value of the operations, value unknown.

12. The Debtor is requesting various forms of relief pursuant to certain motions and applications filed immediately after the filing of the petition and schedules, which are intended to ensure a seamless transition into the Chapter 11 Case to the greatest extent possible.

13. I submit this Declaration in support of such motions and applications to provide an overview of the Debtor's assets, liabilities, and business. I am familiar with the contents of the Petition, Schedules, Statement of Financial Affairs, and each of the motions and applications, including any exhibits and schedules annexed thereto.

14. At this early stage of the Chapter 11 Case, no firm decisions have been made with respect to proposing a plan of reorganization. The Debtor intends to fully explore the possible sale of Open Locations as going concerns, individually and/or as a group, should market conditions permit a sale at fair value. The Debtor will also evaluate the potential for a more traditional reorganization which may include the opportunity for a sale at a later date. In either scenario, the

Debtor will provide for the reconciliation of claims and distributions to creditors in the priorities established by the Bankruptcy Code.

15. I believe that the relief requested in each of the motions and applications listed below (collectively, the "<u>First Day Motions</u>") (i) is necessary to preserve and maximize the value of the Debtor's estate; (ii) is essential to the successful implementation of the Debtor's Chapter 11 reorganization efforts; and (iii) serves the best interests of the Debtor's estate, creditors and other parties in interest. Overall, I strongly believe that the relief requested in the First Day Motions is essential to ensure the success of the Debtors' Chapter 11 reorganization.

16. In addition to the First Day Motions, the Debtor has filed several motions to employ professionals (the "<u>Employment Motions</u>") which do not require immediate hearings but are discussed below for the information of the Court and interested parties.

17. The relief requested in the First Day Motions is intended to minimize the potential adverse effects of the commencement of the Chapter 11 case on the Debtor's on-going business operations and also to enable the Debtors to implement its immediate term strategy, which consists of (i) operating the restaurants in accordance with the Covid-19 rules and regulations imposed by federal, state and local authorities, (ii) the prompt rejection of leases for the Closed Locations, (iii) payment of administrative expenses (including but not limited to post-petition salaries, rent and other operating expenses) in the ordinary course from post-petition revenues and unencumbered funds, (iv) adequate protection payments of non-default rate interest on the Truist Secured Claim, monthly in arrears, and (v) regular payment of post-petition rents and installments due on purchase money equipment financing.

**FIRST DAY MOTIONS**

18. <u>Motion for Interim and Final Orders Granting Authority to Use Cash Collateral.</u>

a. Truist asserts a first-priority security interest in the Debtor's accounts, inventory, equipment, general intangibles, proceeds and products thereof (the "Collateral"), the proceeds of which would constitute "Cash Collateral" as that term is defined in the Bankruptcy Code.

b. The Debtor is dependent upon use of the Cash Collateral to pay on-going costs of operating the business and insuring, preserving, repairing, and protecting all its tangible assets, and thus has an immediate need for the use of Cash Collateral. If not permitted to use the Cash Collateral to pay these expenses, reorganization would be rendered impossible, the going concern value of the business will be lost, and the fair market value of the estate's assets will be significantly reduced, resulting in financial loss to all parties in interest.

c. The Debtor requests the Court to authorize the use of Cash Collateral and offers to provide Truist with adequate protection for the use of its Cash Collateral by (i) limiting the use of Cash Collateral as generally projected in the proposed budget, (ii) making adequate protection payments equal to the non-default rate interest, monthly in arrears, (iii) providing a replacement lien, and (iv) maintaining insurance and providing financial reports.

19. <u>Motion For An Order Authorizing Debtor To (1) Pay Pre-Petition Employee Wages, Salaries And Related Items, (2) Make Payments For Which Payroll Deductions Were Made, (3) Make Pre-Petition Contributions And Pay Benefits Under Employee Benefit Plans, And (4) Pay All Costs Incident To The Foregoing.</u>

a. In order to maintain operations at the Open Locations, the Debtor requires the uninterrupted services provided by its employees. The Debtor employs approximately 775

full-time and 358 part-time employees (collectively, the "Employees") with a gross payroll every two weeks of approximately $725,000. The Debtor owes the Employees compensation on account of salary and wages that were earned through the Petition Date and is obligated to remit associated payroll taxes to the relevant taxing authorities. Additionally, the Debtor provides various employee benefit programs, including health insurance, vacation/PTO, a 401(k) plan with 3% employer matching, expense reimbursements, life insurance, disability/accident insurance, and dental insurance. The compensation, payroll taxes, benefits, and employee programs are more fully described in Exhibit A to the Motion.

b. All Employees are paid in arrears every two weeks, with the most recent payroll being paid on August 31, 2020 for the period August 10 to August 23, 2020. The Debtor's payroll and payroll taxes are paid through Paycom, and the Debtor transfers funds to Paycom at least one day prior to the payroll date. The next payroll is to be funded to Paycom on September 11, 2020 and paid on September 14, 2020 for the period August 24 to September 6, 2020. The gross amount of the two-week payroll paid through Paycom will be approximately $725,000. In addition to payroll, Employees may have incurred pre-petition business expenses which are customarily reimbursed upon proper presentation of an itemization and verification.

c. All pre-petition employee wage claims (i) were earned within one hundred eighty (180) days preceding the Petition Date and (ii) fall below the $13,650 priority limit prescribed by §507(a)(4) of the Bankruptcy Code. All of the Employees are completely or primarily reliant on the timely payment of their wages to cover their monthly living

expenses and timely reimbursement of business expenses. Failure to allow full payment of these wages and expenses would inflict undue hardship on the Employees.

20. <u>Motion For Interim And Final Orders Finding Utilities Adequately Assured Of Payment And Establishing Further Procedures Pursuant To 11 U.S.C. § 366</u>.

a. As of the Petition Date, Debtor was obtaining utility services for the Open Locations and the corporate offices from the utility providers (each a "<u>Utility Provider</u>" and collectively, the "<u>Utility Providers</u>") listed in the Adequate Assurance Chart ("<u>Utility Provider Chart</u>") attached as **Exhibit A** to the Motion. The names, services, amounts owed as of the Petition Date, projected average monthly bill for post-petition services, and the proposed adequate assurance deposit for each Utility Provider are set forth in the Utility Provider Chart.

b. Uninterrupted utility services from Utility Providers are essential to Debtor's ongoing operations in order for the Debtor to prepare food for its customers, clean and sanitize the premises for customer safety, provide a safe environment for its customers and employees, and operate the restaurants in compliance with all federal, state and local regulatory requirements.

c. The Debtor seeks entry of an interim order and a final order which: (i) prohibits Utility Providers from altering, refusing, or discontinuing service to Debtor, (ii) provides that Utility Providers have adequate assurance of payment as set forth therein, and (iii) establishes procedures for determining additional assurance of future payment.

d. In the event any Utility Provider determines that the adequate assurances set forth therein are not satisfactory, then the Debtor proposes that any such disputes be resolved pursuant to procedures which afford the Utility Provider a reasonable opportunity to

negotiate an acceptable outcome with the Debtor and, if necessary, obtain a hearing to determine what assurance will be provided.

21. <u>Motion For Authority to Maintain Existing Deposit Account.</u>

a. Sales to customers at the Open Locations are predominantly made by use of approved credit cards, although some sales are made by cash or check, and orders for delivery or catering are made online.

b. K&W uses Loomis for cash management at the restaurant locations. Each store has a safe that is linked to the Deposit account, the Debtor gets nightly deposit credit based on deposits into the safe at the store, and Loomis picks up the deposits weekly from each location and reconciles to the nightly deposit credit.

c. K&W uses Chase Paymentech for credit card processing and gets daily deposits to the Deposit account on a two-days lag. K&W uses Worldpay to process some catering orders through the Caterease system and uses Zuppler and Door Dash to process online orders. Each firm deposits the online payments (net of any charges) to the Deposit account.

d. To avoid disruption of the day-to-day operations of the Debtor and to ensure an orderly transition into chapter 11, the Debtor seeks an order pursuant to sections 105 and 345 of the Bankruptcy Code authorizing it to maintain Deposit account #0929 at Truist Bank (the "<u>Deposit Account</u>") to receive deposits of cash, checks, credit card receipts and online payments received in connection with the restaurant operations.

e. On a periodic basis, the Debtor will transfer the deposits from the Deposit Account to the debtor-in-possession accounts (the "<u>DIP Accounts</u>") opened at First National Bank of Pennsylvania ("<u>FNB</u>"), from which the Debtor will make all post-petition disbursements in connection with its bankruptcy case.

f.The Debtor will promptly notify Truist Bank that (i) an order for relief under Chapter 11 has been entered, (ii) Truist Bank must not honor any payments made prior to the entry of the order for relief, and (iii) the Debtor will not pay, and will direct Truist Bank not to pay, any debts incurred prior to the entry of the order for relief other than as specifically authorized by the Court.

22.<u>Motion for Authority to Pay Certain Pre-Petition Sales Taxes.</u>

a.The Debtor seeks authority to pay, in its sole discretion, undisputed pre-petition sales taxes collected in the ordinary course of business during the months of August and September, 2020 ("<u>Sales Taxes</u>"), the deposit of which was not due until after the Petition Date, and owed to the Department of Revenue in each of the respective states in which the restaurants are located (collectively, the "<u>Taxing Authorities</u>").

b.In connection with the normal operation of the restaurant business, the Debtor prepares and sells food and related items and collects from the customer the applicable sales tax due on each transaction. The Debtor is liable to the Taxing Authorities for all uncollected Sales Taxes.

c.Sales taxes collected and held by the Debtor constitute "trust fund" taxes and thus are not property of the Debtor's estate, and such tax obligations constitute a priority claim pursuant to Section 507(a)(8) of the Bankruptcy Code.

d.The Debtor has sufficient cash reserves and will have sufficient cash from ongoing operations to pay the Sales Taxes in the ordinary course of business.

23.<u>Motion Of Debtor For An Omnibus Order (I) Authorizing And Approving (A) Rejection Of Certain Unexpired Leases As Of The Petition Date, (B) Abandonment of Dish</u>

<u>Machines and LED Lighting Subject to Encumbrances, (C) Abandonment Of *De Minimis* Assets Free and Clear of All Encumbrances, and (II) Granting Related Relief</u> (the "<u>Rejection Motion</u>").

 a. Prior to the Petition Date, the Debtor ceased its restaurant operations at the eight (8) locations identified on <u>Exhibit 1</u> to the Rejection Motion (the "<u>Closed Restaurants</u>"), removed most of its tangible personal property from each Closed Restaurant location (the "<u>Premises</u>"), and surrendered the Premises to the applicable landlord.[3]

 b. The Debtor did not remove dish machines and LED lighting (the "<u>Encumbered Equipment</u>") from certain Premises identified on <u>Exhibit 2</u> to the Rejection Motion. The Encumbered Equipment is subject to purchase money security interests in favor of certain lenders as identified on Exhibit 2. The Encumbered Equipment is also subject to the blanket lien of Truist Bank as more specifically set forth in the *Motion for Interim and Final Orders Granting Authority to Use Cash Collateral* filed by the Debtor on the Petition Date.

 c. The Debtor also did not remove certain tangible personal property located at the Premises of each Closed Restaurant that, in the Debtor's business judgment, is of no value, inconsequential value, or is burdensome to the Debtor's estate (the "<u>De Minimis Assets</u>"). The list of De Minimis Assets remaining at the Premises of each Closed Restaurant is set forth on <u>Exhibit 3</u> to the Lease Rejection Motion, along with the estimated value of the assets. The De Minimis Assets are also subject to the blanket lien of Truist Bank.

 d. The Debtor seeks authority to (a) reject the Leases for the Closed Restaurants as of the Petition Date, (b) abandon the Encumbered Equipment, subject to all liens, claims,

---

[3] The Premises located in Charlotte, North Carolina and owed by Pinnacle Point, LLC (Store No. 47) is subleased by the Debtor to The City Kitch LLC. As of the Petition Date, The City Kitch LLC has possession of the Premises pursuant to the sublease with the Debtor.

interests and encumbrances (the "Encumbrances"), and (c) abandon the De Minimis Assets free and clear of all Encumbrances. Truist Bank consents to the relief requested in the Rejection Motion.

e. The Debtor has determined in the exercise of its reasonable business judgment to vacate and surrender the Premises for the Closed Restaurants and abandon the Encumbered Equipment and De Minimis Assets located therein.

f. The Leases for the Closed Restaurants have no economic value to the Debtor's estate and constitute an unnecessary drain on the estate's resources. Absent rejection, the Debtor could be obligated to pay rent and other associated costs under the Leases which, in the aggregate, exceed $112,000 per month.

g. The Encumbered Equipment and De Minimis Assets also have no economic value to the Debtor's estate. The costs of relocating and storing the De Minimis Assets would far exceed any potential recovery from a future sale. The administrative expenses that would be incurred by the Debtor if it were to sell the De Minimis Assets from the Premises also would far exceed the net sales proceeds recovered by the Debtor.

h. The Debtor requests that the lenders, with respect to the Encumbered Equipment, be authorized to seize and dispose of the Encumbered Equipment without any further notice or liability to any party. The Debtor further requests that the landlords, with respect to the Premises, be authorized to use or dispose of the De Minimis Assets without any further notice or liability to any party. To the extent applicable, the automatic stay should be modified to permit such seizure, use and/or disposition by the lenders and landlords.

24. <u>Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Maintain and Administer its Existing Customer Programs and Honor Certain Pre-Petition Obligations Related Thereto and (II) Granting Related Relief</u>

    a.    The Debtor seeks interim and final orders authorizing it to maintain and administer its gift card, gift certificate, credit card processing, and other customer-related programs (collectively, the "<u>Customer Programs</u>").

    b.    The Debtor maintains programs pursuant to which its customers can purchase pre-paid, non-expiring gift cards or gift certificates (collectively, the "<u>Gift Cards</u>") in exchange for a return in various denominations, typically between $25 and $300. The Gift Cards can then be redeemed for purchases at a later date. The Debtor sells the Gift Cards to its customers in its restaurants and online. The Debtor estimates that as of the Petition Date, it had approximately 73,022 gift cards outstanding, with a total balance of $734,963.97. Prior to issuing gift cards, the Debtor issued gift certificates, and the outstanding gift certificate balance is nominally $516,721. However, gift certificates were last issued decades ago and only about 5-10 gift certificates are redeemed in a given year (i.e., less than $500/year worth of gift certificates would be expected to be redeemed in any given year).

    c.    The Debtor also issues deals, specials, and coupons for discounts or incentives on purchases (the "<u>Customer Incentives</u>") to customers through direct mail, in-store flyers, and online channels. The Customer Incentives are an important part of the Debtor's marketing strategy, as they engender goodwill for the brand, and generate revenue by encouraging sales.

d. In addition to cash, the Debtor accepts credit card payment from customers at in-store and online points of sale (the "Credit Card Payments"). To process Credit Card Payments, the Debtor is party to certain credit card processing agreements (the "Payment Processing Agreements") with payment processors Chase Paymentech and American Express (the "Payment Processing Companies). Pursuant to the Payment Processing Agreements, the Debtor generally receives the net customer sales less any chargebacks and processing fees charged. The processing fees charged by each company vary but are in the range of 0.2 percent to 2.5 percent (together, with any chargebacks or other obligations under the Payment Processing Agreements, the "Processing Obligations"). The total amount of pre-petition accrued but unpaid Processing Obligations is approximately $35,000 and reflect only those accrued Processing Obligations that routinely occur during the payment processing cycle. This amount is fully secured by the Payments Processing Companies' rights of setoff with respect to credit card receipts collected pre-petition.

e. The Debtor's continued acceptance of Credit Card Payments is essential to the operation of the Debtor's business because the majority of the Debtor's sales-indeed, the majority of all restaurant sales-are made using Credit Card Payments. Declining to accept Credit Card Payments would have a severe negative effect on the Debtor's ongoing operations, the cost of which would be borne by its estate. The ability to honor Credit Card Payments is critical in any case but is even more in a COVID-19 "touchless" environment.

**EMPLOYMENT MOTIONS**

25. Application to Employ Bankruptcy Counsel.

a. The Debtor seeks approval by this Court of the employment of John A. Northen and members of the firm of Northen Blue, LLP ("Northen Blue"), attorneys who are duly

admitted to practice in this Court, as the Debtor's bankruptcy counsel. The professional services to be offered by Northen Blue are set forth in the application, but generally consist of representing the Debtor with respect to all motions, applications, reports, disclosure statement and plan of reorganization.

b.  Northen Blue has filed an affidavit with the application, confirming that it is disinterested and disclosing the information required by Bankruptcy Rules 2014 and 2016. Northen Blue has agreed to represent the Debtor for compensation based upon the customary hourly rates charged by the firm at the time such services are rendered, plus reimbursement of actual and necessary expenses and other charges incurred, in such amounts as may be subsequently allowed and approved by the Court in accordance with the Chapter 11 Fee Application Guidelines for the Middle District of North Carolina. Northen Blue has received no compensation from Debtor or anyone else on account of Debtor, except as set forth in the Affidavit.

c.  The Debtor selected Northen Blue due to the extensive experience and expertise of the firm in representing debtors in Chapter 11 cases. The Debtor believes that the services to be provided by Northen Blue can and will provide specific benefits to the Debtor and its services will enhance the administration of this case. The Debtor believes that such services will be in the best interest of all parties involved in this proceeding, and that Northen Blue can manage and apportion the services required to minimize any duplication or unnecessary expense.

26.  <u>Application to Employ Special Counsel (Corporate).</u>

a.  The Debtor seeks approval by this Court of the employment of Joan Balderamos (real estate), Galen Craun (corporate), and other members of the firm of Bell Davis & Pitt,

P.A. ("BDP"), attorneys who are duly admitted to practice in North Carolina, as the Debtor's special counsel. The professional services to be offered by BDP are set forth in the application and generally consist of representing the Debtor with respect to matters involving general corporate law, regulatory issues, real estate leases and sales, and associated transactional aspects of any sale of the Debtor's assets.

b. BDP has filed an affidavit with the application, confirming that it does not represent or hold any interest adverse to the debtor or to the estate with respect to the matters on which they are to be employed and disclosing the information required by Bankruptcy Rules 2014 and 2016.

c. BDP has represented the Debtor pre-petition with respect to acquisitions, sales, leases, financing, and other matters related to the Debtor's business and is well-versed and familiar with the Debtor's business. The Debtor has selected BDP because of its experience in corporate, regulatory and transactional law as well as its knowledge of the Debtor's business.

27. Application to Employ Special Counsel (Labor and Employment Law).

a. The Debtor seeks approval by this Court of the employment of Kenneth P. Carlson, Jr. and other members of the firm of Constangy Brooks Smith & Prophete, LLP ("CBSP"), attorneys who are duly admitted to practice in North Carolina, as the Debtor's special counsel. The professional services to be offered by CBSP are set forth in the application and generally consist of representing the Debtor with respect to matters involving labor and employment law and related regulatory issues.

b. CBSP has filed an affidavit with the application, confirming that it does not represent or hold any interest adverse to the debtor or to the estate with respect to the

matters on which they are to be employed and disclosing the information required by Bankruptcy Rules 2014 and 2016.

c.      CBSP has represented the Debtor pre-petition with respect to labor and employment law issues, including but not limited to notice requirements and responsibilities under federal and state laws and regulations governing the termination of employment, benefit plans, and other matters related to the Debtor's employees, and the firm is well-versed and familiar with the Debtor's business.  The Debtor has selected CBSP because of its experience in labor and employment law as well as its knowledge of the Debtor's business.

28.      Application to Employ Accountants.

a.      The Debtor seeks approval by this Court of the employment of Dixon Hughes Goodman, LLP ("DHG") as the Debtor's accountants to prepare the Company's income tax returns and to complete an audit of the Debtor's 401(k) Plan as required in connection with the Debtor's annual reporting obligation under the Employee Retirement Income Security Act of 1974 ("ERISA").

b.      DHG has filed an affidavit with the application, confirming that it is disinterested and disclosing the information required by Bankruptcy Rules 2014 and 2016.

c.      DHG has agreed to (i) prepare the Debtor's income tax returns for FYE 6/30/20 for a flat fee of $30,000.00, plus reimbursement of actual and necessary expenses, pursuant to Section 328, and (ii) provide an audit of the Debtor's 401(k) Plan on an hourly fee basis, plus reimbursement of actual and necessary expenses, pursuant to Section 327, subject to approval by the Court in accordance with applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, Local Rules of the Court, and the Chapter 11 Fee Application Guidelines for the Middle District of North Carolina.

d.  Prior to commencing work on the income tax returns for the fiscal year ending June 30, 2021 or subsequent periods, or commencing work on any future audits of the Debtor's 401(k) Plan, the Debtor and DHG will enter into mutually acceptable engagement agreements with respect to fees and expenses for such subsequent services, subject to Court approval after notice and hearing.

For the reasons stated herein and in each of the First Day Motions and the Employment Motions filed in connection with the commencement of this Chapter 11 case, I respectfully request that each of the First Day Motions and the Employment Motions be granted in its entirety, after due notice and hearing, together with such other and further relief as this Court deems just and proper.

[signature page to follow]

I declare under penalty of perjury that the foregoing is true and correct.

Date: 08-28-2020

*Dax C. Allred*
Dax C. Allred

Sworn to and subscribed before me on 08-28-2020.

*Bobie Jo Shore*
Notary Public
My Commission expires: 09-22-2020

BOBIE JO SHORE
NOTARY PUBLIC
Surry County
North Carolina
My Commission Expires Sept. 22, 2020